The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer and the briefs of the parties as well as argument by defense counsel. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers Compensation Act.
2. The employee-employer relationship existed between plaintiff and defendant-employer.
3. CNA Insurance Company was the carrier on the risk.
4. The plaintiffs average weekly wage on May 29, 1996, the date of her injury was $292, yielding a compensation rate of $194.67 per week, which is subject to verification through a Form 22.
5. Prior to the hearing before the Deputy Commissioner, the parties stipulated to the submission of nine pages of medical records from Dr. Charles Stewart and the Kernodle Clinic, which were attached to the Pre-trial agreement.
6. Subsequent to the hearing before the Deputy Commissioner, the parties stipulated to additional medical records, which were furnished to the Commission with Mr. Stedmans cover letter of September 17, 1999, as follows:
(1) Alamance Regional Medical Center (6 pages);
(2) Karen Barwick, D.D.S. (2 pages);
(3) Central Florida Orthodontic Specialists (1 page);
(4) Citrus Memorial Hospital (4 pages);
(5) Fountain Olmstead Torney Mohorn (1 page);
 (6) Independent Medical Examination of Dr. Greenberg (4 pages)
 *********** EVIDENTIARY RULINGS
One month prior to Dr. Stewarts deposition, by letter dated September 3, 1999 and copied to the Deputy Commissioner, Ms. Adcock, defense counsel, advised Mr. Stedman, plaintiffs counsel, that defendants would not stipulate into evidence the medical records of Dr. Stanley and Dr. Nathan. However, defendants would agree to depose those physicians. Assuming plaintiff would benefit from the introduction of these medical records into evidence, the burden was on plaintiff to notice and schedule the necessary depositions. However, plaintiff chose not to notice any depositions to authenticate and introduce these records into evidence and thus no depositions were scheduled. Nevertheless, plaintiff attempted to offer these records, which had not been authenticated or otherwise admitted into the record at the deposition of Dr. Stewart who was not competent to authenticate the records for purposes of introducing them into the record for the truth of any of the matters contained in the records. Accordingly, defendants later objected to the introduction of these records. Although the records could have been introduced into the evidentiary record through Dr. Stewarts deposition for the limited purpose of the foundation of Dr. Stewarts opinions had he relied on the records, in view of the fact that Dr. Stewart made no referrals to either Dr. Stanley or Dr. Nathan and did not review or rely upon their records in forming his opinions or testifying, defendants objections are hereby sustained. Furthermore, it was not required by the standard stipulations boilerplate language that defendants object at the deposition or waive their objection. All objections are preserved except those that pertain to the form of a question. Therefore, the records of Dr. Stanley and Dr. Nathan are hereby excluded from the evidentiary record.
 ***********
Based upon the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff, a twenty-five year-old high school graduate, was working full time as a phlebotomist and taking classes towards her college degree.
2. Plaintiff began working for defendant as a histotechnician in May 1996. On May 29, 1996, she caught her foot in a stool at her workstation, and fell off the stool, hitting her head on a counter top, and then fell to the floor.
3. Plaintiff was seen that day by Dr. Charles Stewart at the emergency room of Alamance Regional Medical Center. X-rays were taken of plaintiffs cervical and lumbosacral spine, and the nasal passages, with no evidence of fractures. A CT of the head was negative and an MRI and EEG of plaintiffs brain were normal. Dr. Stewart assessed plaintiff with a concussion, prescribed Toradol and scheduled a follow-up visit for her. Her mental status was normal when she left the ER that day.
4. Plaintiff was seen by Dr. Stewart on June 3, 1996, at which time he found minimal symptoms of concussion, with a normal mental status. She had no complaints of headaches at the time. Dr. Stewart treated her with prescription medication for mild pain in her right ear. He released her to return to work the next day. He did not anticipate further follow-up treatment unless plaintiff developed headaches or an increasing tendency to sleep.
5. Plaintiffs fall of May 29, 1996 caused several chipped teeth and one tooth abscess. She was evaluated and treated by Karen D. Barwick, D.D.S. who restored the chipped teeth with composite resin and performed a root canal. According to Dr. Barwick, if the teeth that were traumatized abscess, then root canal therapy will be needed.
6. Plaintiff did not seek additional medical treatment from Dr. Stewart or any other physician, related to her accidental injuries until October 4, 1996, when she returned to Dr. Stewart. At that time she was complaining of recurrent moderate to severe headaches and spells of "passing out. Dr. Stewart prescribed medication and ordered an MRI, which was normal.
7. Dr. Stewart continued to treat plaintiff for her headaches through 1996, 1997 and into 1998. As of October 29, 1996, it appeared that her headaches were well controlled with Amitriptyline, with no side effects. Dr. Stewart also continued to prescribe her Ultram for symptomatic treatment of headaches.
8. On November 11, 1996, plaintiff called Dr. Stewarts office and requested a note excusing her from work for 3 or 4 days due to headaches, but Dr. Stewart had not seen or treated her on those days, as he indicated on the note.
9. Plaintiffs next visit to Dr. Stewart was on April 2, 1997, when she reported continued headaches of moderate to severe intensity, and no recurrent episodes of loss of consciousness. He continued her medications.
10. On April 4, 1997, when seen by Dr. Stewart, plaintiff reported a severe headache the previous night with vomiting, and a brief episode of loss of consciousness. She told him the Ultram made her nauseated. Dr. Stewart discontinued the Ultram and started her on a trial of Phrenilin Forte. He wrote a note excusing her from work.
11. On April 14, 1997, plaintiff reported to Dr. Stewart that the Phrenilin was helping with the severity of her headaches within the last week and that the Amitriptyline had also helped with the headaches and nausea.
12. On May 22, 1997, plaintiff reported to Dr. Stewart that she had played softball the previous weekend and had some knee pain, but no discrete injury to her knee. She reported 3 to 4 bad headaches the previous week. She continued taking the prescribed medications.
13. Plaintiff also saw Dr. Stewart on June 19, July 29, August 19 and September 30, 1997. On her last visit of September 30, 1997, Dr. Stewart noted that she had done well with headache control. He anticipated that she would continue to suffer from headaches related to the trauma of her fall of May 1996 and would need to continue to take medication.
14. At the request of plaintiff, Dr. Stewart provided notes that she could not work due to migraine headaches on the following dates: 1/10/97, 1/13/97, 2/4/97, 4/4/97, 4/23/97, 5/19/97, 7/22/97, 7/23/97, and from 1/26/98 to 2/2/98.
15. According to the greater weight of the evidence, including the medical notes and testimony of Dr. Stewart, plaintiffs migraine headaches were caused by her fall of May 29, 1996. Plaintiff had no migraines prior to that time, and the accident precipitated the start of her headaches.
16. On August 26, 1997, plaintiff submitted a resignation letter to defendant-employer. Although plaintiff testified that she had developed sensitivity to formalin fumes, the evidence does not establish that any such sensitivity was caused by the May 29, 1996 injury by accident.
17. After resigning her employment, plaintiff worked as a teaching assistant for about 5 to 6 months. She also worked part-time at Bugle Boy. In February 1998, plaintiff moved to Florida. She began working at the Black Diamond Golf Course. She later began working for Histopath, and then as a phlebotomist for the community blood bank where she remained employed at the time of the hearing before the Deputy Commissioner.
18. Plaintiff is now taking classes at Central Florida Community College, 8 to 9 hours per semester. She is studying to be a physicians assistant.
19. On June 9, 1999, plaintiff underwent an independent medical examination by Dr. William R. Greenberg. He confirmed that her latest MRI from Citrus Memorial Hospital was normal and that her exam revealed normal mental status testing and speech function. He noted that she was very physically active, playing softball on a semi-pro level. As assessed by Dr. Greenberg, plaintiff has reached maximum medical improvement. She will need to be seen by a physician about four times a year until her headaches are under better control.
20. As noted by Dr. Greenberg, and from plaintiffs testimony, plaintiff is extremely physically active. At the hearing before the Deputy Commissioner, she was alert and articulate. Although she developed migraine headaches following the accident of May 29, 1996, the evidence does not establish that the accident caused any mental impairment. All physical examinations and testing, such as the MRIs of the brain, show no physical damage to the brain that would be compensable.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as matters of law the following
 CONCLUSIONS OF LAW
1. As a result of her compensable injury of May 29, 1996, plaintiff developed migraine headaches, which were continuing as of the date of the hearing before the Deputy Commissioner. Plaintiff also sustained damage to her teeth, which required dental treatment and repair. Therefore, defendants are responsible for all reasonably necessary medical expenses incurred by plaintiff for treatment, which tends to effect a cure, provide relief or lessen the period of disability for these injuries which has been rendered or may in the future be necessary, subject to the limitations of N.C. Gen. Stat. 97-25.1. N.C. Gen. Stat. 97-2(19) and 97-25.
2. Due to her migraine headaches, plaintiff was unable to work and earn wages and missed the following dates of work for which she is entitled to compensation for temporary total disability: May 29-June 3, 1996, January 10 and 13, 1997, February 4, 1997, April 4 and 23, 1997, May 19, 1997, July 22 and 23, 1997, January 26-30, 1998, February 2, 1998, June 15, 1998, and July 6 and 29, 1998. N.C. Gen. Stat. 97-29.
3. Plaintiff has reached maximum medical improvement, with no evidence of any brain injury. Therefore, plaintiff is not entitled to any permanent partial impairment award for damage to an internal organ. N.C. Gen. Stat. 97-31.
4. The evidence fails to establish that plaintiff is entitled to any compensation for damage to her teeth, as there were no extractions and no crowns. Furthermore there is no compensable disfigurement. N.C. Gen. Stat. 97-31(21).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission adopts and affirms the holding of the Deputy Commissioner and enters the following
 ORDER
1. Defendants shall pay all reasonably necessary medical expenses incurred by plaintiff for treatment of the injuries sustained in the accident of May 29, 1996, which tends to effect a cure, provide relief or lesson the period of disability, subject to the limitations of N.C. Gen. Stat. 97-25.1. This includes payment for ongoing medical monitoring and treatment of plaintiffs migraine headaches.
2. Defendants shall pay plaintiff compensation at the rate of $194.67 per week for temporary total disability for the dates set forth above forth above in Conclusion of Law No. 2. Defendants are entitled to a credit for any periods for which benefits have already been paid.
3. A reasonable attorneys fee of twenty-five percent of the net compensation awarded to plaintiff in this Opinion and Award is approved for her counsel.
4. Defendants shall pay the costs.
This the ___ day of March 2001.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER